At a Court of Oyer and Terminer held at this term, George W. Buchanan, was indicted and tried for the murder of David *Page 80 
S. Casperson in the first degree. The prisoner and the deceased owned and resided on adjoining farms in Appoquinimink hundred, a portion of the divisional boundary of which was in dispute between them. On the 15th day of April preceding the prisoner had several men employed in erecting a fence upon it, and was himself engaged with a briar scythe in cutting briars near the line on his side of it. when the deceased came across his land up to the fence, where they were at work, and in a rude and excited manner asked the prisoner what he was puting up the fence there for, and said to him that if he put it up, he would take it away; to which the prisoner replied that if he did, he would put it up again. Further words ensued between them in regard to the matter, characterized by anger and profanity on the part of the deceased, when the prisoner told him to go away and to go home, as he did not want to have anything to do with him, and resuming the use of his scythe upon the briars, forewarned him against coming on his premises, on which the deceased jumped over the fence and said to him, "damn your premises, here I am, and you can't help yourself?" The prisoner who was then from twenty to thirty feet from him, stepped rapidly towards him with the scythe in his right hand and the blade of it just above the ground, while the deceased made one or two steps toward him, and as they came together face to face, the prisoner gave a quick short jerk to the scythe inflicting a deep cut in the calf of his right leg and severing two of the main nerves, and the small bone of it. The latter then seized hold of him and the handle of the scythe when the prisoner gave it another short jerk higher above the ground, which inflicted another severe cut in the left thigh and groin of the deceased, who then gave way and fell to the ground across and upon the blade of the scythe. He was soon afterwards removed to his home, and a physician sent for who testified that he reached his house about nine o'clock that morning, and found that he had lost a great deal of blood and was almost pulseless, and that he complained *Page 81 
of a great deal of pain in the groin. He described the two wounds, the only ones received, and expressed the opinion that the cut in the calf of his leg was a mortal wound, and the cause of his death, and would have produced it, if he had not received the other. The cut in the thigh and groin was not a mortal wound of itself, although he considered and believed that it contributed with the other by the shock to his nervous system which accompanied it, the irritation which it excited, and the mortification which followed the wounds in the calf of the leg and could not be prevented, to produce his death. Another physician testified that he was called to see him two days afterwards, and found him very much prostrated, and his right leg from the knee down in a state of mortification, and thought from that time he would die, and that there was scarcely a hope of his recovery. All was done for him that could have been done in the medical science to save his life, and he knew of nothing that could have saved his life; amputation could not have done it. His whole appearance then was cadaverous and deathlike, and he was suffering from great prostration.
In addition to the preceding evidence it was proved that although he lingered and did not expire until several days afterwards, the deceased had from the first day expressed his belief that he must die of the wounds received; but it was also proved that three or four days after he had been wounded he enquired of a friend on a visit to him what he thought of his condition, and who told him he must die, and that up to that time his attending physician, of whom a similar enquiry had in the mean while several times been made by him, had encouraged the hope of recovery on his part, but on being asked the question after that time by him, made no reply to it.
And on this proof being made the state proposed to put in evidence certain declarations subsequently made by the deceased that the wounds were inflicted upon him by the prisoner, and the manner in which he did it, but which was objected to by the counsel for the prisoner. *Page 82 
The Court had been and should always be cautious in admitting what were termed dying declarations in evidence, as such declarations were often made in critical danger of death, and in a state of apprehension and despondency, before all hope or expectation of ultimate recovery had been entirely abandoned by the person making them, but as far as the testimony had gone on this subject, the Court did not feel satisfied on that point, and must therefore exclude the evidence offered.
The defense then proceeded and proved that the fence which the prisoner was at the time having erected, was on the boundary line between the two farms, on which a division fence had previously stood for more than twenty years, and that the deceased had only a short time before taken down and carried away the rails of a former fence erected by him in the same place, and that the deceased had declared with an oath that he would kill Buchanan, or Buchanan should kill him before a fence went up there to stand, and had sent a message to him by a neighbor that if he did not quit aggravating him about that little piece of land, he would kill him. The defense also proved by numerous witnesses the good character and peaceable disposition of the prisoner.
The only question of fact involved in the case was whether either of the wounds was inflicted by the prisoner directly, and if so, whether intentionally, and whether the fatal wound in the calf of the leg was not produced by the fall of the deceased upon and across the blade of the scythe; whilst the only question of law was whether the killing under the circumstances amounted to the crime of murder in the second degree or manslaughter. It was contended, however, by the counsel for the prisoner that as none of the witnesses saw the scythe blade actually inflict either of the wounds, and as that in the calf of the leg was so much more severe than the other, and was alone mortal in its character, he must have instantly *Page 83 
fallen had it been inflicted before the other in the thigh, and whilst he was yet standing, and therefore if in the struggle between them, and after the cut in the thigh the deceased fell upon the scythe blade, and received the mortal wound in the calf of his leg in the fall, it was the result of accident, and the killing in that case would not amount even to manslaughter. It was so held and ruled under like circumstances in the case of Regina v. Smith, 34 E. C. L. Rep. 334, Reginav. Kirhane, 34 E. C. L. Rep. 318. And although the briar scythe was a deadly weapon, and both wounds were directly and intentionally inflicted by the prisoner, yet if the jury should believe from the evidence that he did not use it with intent to kill, or to do great bodily harm to the deceased, as they might well infer from the short jerk and the slight force with which he used it, the offense could only amount to manslaughter. Ros. Cr. Ev. 729, 2 Cowp. 830, 2Perk. Cr. Rep. 637. And furthermore under all the facts proved the case could not, even in the worst aspect in which it could be viewed, rise above the grade of manslaughter.
The Court, Gilpin, C. J., charged the jury, that inasmuch as our statute in relation to murder and manslaughter employs familiar terms with reference to them, of fixed legal import at common law, without any definition or qualification of their meaning, it must, of course, be understood to use them in the same sense in which they are employed and understood at common law, and the division which it makes of murder into two degrees must be understood to be made with reference to the two kinds of malice aforethought, one or the other of which was always essential to constitute the crime of murder at common law, and which was of but one degree in this State prior to the passage of the act and the recent codification of our statutes. What, therefore, was murder or manslaughter at common law, still continued murder or manslaughter under the statute in this state; the one or the other of the two descriptions of malice aforethought required to *Page 84 
constitute the crime of murder at common law, being respectively denominated express malice aforethought, and malice aforethought implied by law, although the crime is the same when committed with either, and is alike punishable with death at the common law. In view of this distinction the statute in terms provides that when it is committed with express malice aforethought or in perpetrating or attempting to perpetrate any crime punishable with death by our laws, it shall be murder of the first degree, and punishable with death; but without employing the other and correlative terms of the common Jaw, to define and distinguish from it malice implied by law, it simply provides that when it is committed otherwise than has been just stated with reference to express malice, it shall be murder of the second degree. It is manifest however, that this means merely that when it is committed with malice aforethought implied by law, it shall be murder of the second degree under the statute, and punishable with whipping, pillory and imprisonment for life. The only object of the distinction being to discriminate in the penalties prescribed in the two degrees into which murder is now divided by the statute.
According to the definition of the crime of murder at common law, it is committed with express malice aforethought when the killing is done with a sedate deliberate mind and formed design, which is evidenced by external circumstances discovering or disclosing the inward intention, such as lying in wait, antecedent menaces, former grudges and concerted schemes to do the party killed some great bodily harm; and only when it is so committed can it constitute murder of the first degree under the statute. In such cases when the killing is done with a sedate deliberate mind and formed design, it is a conclusion of law that it was done with actual malice, or with express malice aforethought in the legal sense and meaning of those terms. But to make it so, it was not necessary that it should have been uttered or expressed in words, or that the design to do it should have been formed *Page 85 
for any length of time before the killing, if done in cool blood and with a sedate deliberate mind and formed design. And malice aforethought is implied by law from any deliberate cruel act committed by one person against another, however sudden; thus where a man kills another suddenly, without any, or without a considerable provocation, the law implies malice; for no person, unless of an abandoned heart, would be guilty of such an act upon a slight or no apparent cause. Such is the definition and illustration of malice aforethought implied by law, as recognized at common law; and even when the cruel act is committed however suddenly, without any, or without a considerable provocation, it must be a deliberate, as well as a cruel act to complete and constitute what is regarded and denominated at common law, as malice aforethought implied by law.
But in the absence of such evidence or indications of express malice aforethought, as we have before mentioned, the law will imply that it was committed with malice aforethought, when the killing is done, or the mortal wound is inflicted with a deadly weapon and without sufficient provocation and heat of blood, such as occurs in mutual combat or a fight, to reduce it to the crime of voluntary manslaughter in contemplation of law, for this is what is implied in the use of the terms, "a considerable provocation," in the definition of malice aforethought implied by law as just stated. And in such case it will be murder with implied malice aforethought, as it is termed at common law, and will only amount to the crime of murder in the second degree under out statute; but without such provocation the voluntary killing of a human being with such means cannot be reduced to the crime of manslaughter at common law, or under the statute.
He would not refer to, or attempt to state the facts proved in the case, except so far as it might be necessary to do so in order to announce the rules or principles of the law applicable to them. The facts and circumstances of the case and all the questions which had been raised *Page 86 
with regard to them, or any of them, were to be carefully considered and determined by the jury upon all the evidence which had been produced before them in the trial; and if they should be satisfied from it, that David S. Casperson died of the wounds described in the evidence and received by him in the attack made upon him by the prisoner at the time and place, and in the manner stated in the evidence, and that those wounds were intentionally inflicted upon him by the prisoner, with the blade of the scythe, with which he was cutting briars when Casperson jumped over the fence and entered his premises against his order and admonition immeditaely before given him, and which he carried in his right hand as he hurried rapidly up to him, neither the trespass on his premises by Casperson, even under such circumstances, or any defiance which he may have given him when he did so, or any angry or insulting language which he had previously addressed to him, or any former removal of the fence by him, or any menaces or threats before made by him to kill the prisoner, could either separately or collectively, justify or excuse in law, such an attack by the prisoner upon him. And although assuming such to have been the case, and that both of the wounds were intentionlly inflicted by the prisoner, there was in the opinion of the Court enough in the facts and circumstances proved and not disputed in the case, to negative and disprove the crime alleged in the indictment, that it was committed with express malice aforethought, and was consequently murder of the first degree under the statute.
As we have before remarked, however, in all cases of the unlawful and voluntary killing of one person by another without express malice aforethought, but without sufficient provocation in contemplation of law to extenuate and reduce it to the crime of manslaughter, the law itself will imply that it was done with malice aforethought, and it therefore becomes murder of the second degree under our statute. At common law there being but one degree of murder, and the crime being one and the same, and alike punishable with *Page 87 
death, whether committed with express or implied malice aforethought, we have no such general and established definition of the latter as of the former in the books and adjudged cases on this subject at common law; and therefore where the killing was a crime the only practical and substantial question involved at common law, was whether it was committed with either express or implied malice aforethought, or under such circumstances of provocation and alleviation as will suffice in law to negative the existence of malice aforethought, either express or implied, but not to justify or excuse it entirely, or in other words, whether it was murder or manslaughter at common law. And accordingly at common law where the killing was voluntary and unjustifiable or inexcusable, but without express malice aforethought, as before defined, and was also without such provocation or alleviation as would suffice to negative the existence of malice aforethought entirely, and thus to reduce it to the crime of manslaughter, it constituted murder committed with malice aforethought implied by law; because malice aforethought, either express or implied by law, has ever constituted the essential ingredient and characteristic of the crime of murder at common law.
But if the jury should be satisfied from the evidence in the case that the cut in the calf of the right leg of Casperson was the only mortal wound which he received in the attack made upon him by the prisoner, and that it was voluntarily and intentionally inflicted upon him by the prisoner with the blade of the scythe with which he was then cutting briars, and which he carried and held in his right hand, as he hurried rapidly up to him over a space of twenty or thirty feet, and that wound was the sole, or principal cause of Casperson's death, then we are bound to instruct you that we do not consider that the unlawful and wrongful act, the violent menaces and threats and the angry, insulting and defiant language of Casperson before referred to, and more particularly specified by us, however aggravating they may *Page 88 
have been to the prisoner, could under all the facts and circumstances proved in the case, and not controverted, constitute such a provocation in contemplation of law as could reduce the killing of him to the crime of manslaughter, or negative the existence of such malice aforethought as the law itself necessarily implies in such a case. For it is well settled that no mere threats, however violent, no mere words however insulting or offensive, and no mere entry or trespass on the lands and premises of another against his admonition or commands, however wrongful it may be, can justify or excuse a resort in the first instance to such force and violence and the use of such a deadly instrument as the briar scythe proved and produced before you, to repel the intrusion or trespass on his premises, or the sudden assault and attack which he made upon him with it. And in such a case the provocation not being sufficient in law to mitigate and reduce it to manslaughter, the law will imply that the killing was with malice aforethought, and which constitutes murder of the second degree under our statute.
According to the testimony of the several persons who were present on the occasion and employed in erecting the fence, as soon as the prisoner had reached the position of Casperson, and was face to face with him, and with the blade of his scythe near the ground, and partly behind the legs of Casperson, they saw the prisoner give the scythe a short jerk near the ground towards Casperson and himself, but they could not see whether the blade of it touched any part of Casperson's person or not, he then made, however, no outcry or exclamation of any kind to lead them to think that he was either cut or hurt by it, but they saw him immediately after that seize hold of the handle of it, and of the prisoner, when the latter gave it another short jerk, but considerably higher above the ground, again however, without their seeing the blade of it touch any part of Casperson's person, but they soon afterwards saw him fall to the ground, partly across the blade of the scythe, and then heard him cry out to them *Page 89 
not to let the prisoner kill him, and on one of them hurrying up to them and laying hold of the handle of it still in the hands of the prisoner, he said to him "take care John, I do not intend to strike him any more!" And on this evidence the learned counsel for the prisoner have contended that it is not proved that he inflicted either of the wounds, or if he did, that he did not inflict either of them intentionally, and they have furthermore contended that as Casperson exhibited no sign or symptom of having been cut or hurt on the first short jerk of the scythe when the blade of it was nearest the ground behind him, and did not fall until after the second short jerk of it was made by the prisoner considerably higher above the ground, he could not have been cut in the calf of his right leg by the first jerk of the scythe, and before he had been cut in his right thigh and groin, inasmuch as the cut in the calf of his leg, according to the testimony of the physicians, was far more severe and disabling than the cut in the thigh and groin, and was in their opinion the only necessarily fatal wound of itself which he received, and that he therefore must have received that wound, if not the other also, in his fall on the blade of the scythe; and in this view of the matter as presented by them, they have asked the Court to charge you that if neither of the wounds described were in fact inflicted by the prisoner, and intentionally by him, and particularly, if the wound in the calf of the leg was not so inflicted by him, but was accidentally received by Casperson in his fall on the blade of the scythe, then it was the result of accident, and the prisoner did not inflict it, and could not be held responsible for it, or guilty even of manslaughter. But all that matter is purely a question of fact which the jury are to consider and decide from all the evidence in the case, without any comment or instruction from the Court as to what is, or is not proved by it on either of those points, or questions of facts raised in the case. If, however, the jury should not be satisfied beyond any reasonable doubt after carefully considering and weighing all *Page 90 
the facts and circumstances proved in the case that Casperson's death was the result of the two wounds received by him and described, and that they were voluntarily and intentionally inflicted by the prisoner by cutting him with the scythe in the attack stated and described, or, in particular, that the cut in the calf of his right leg was the only mortal wound he then and there received, and that it was voluntarily and intentionally inflicted upon him by the prisoner by cutting him with the scythe, as before stated, it would be their duty to acquit him of any offense whatever, and to return a verdict of not guilty under the indictment; for although he stood indicted for murder of the first degree solely, it was competent for the jury by virtue of the statute to find him guilty of murder of the first, or of the second degree, or of manslaughter, or to acquit him entirely under it, according as the evidence in the case and the law applicable to it should warrant and require at their hands.
Verdict — Guilty of murder of the second degree. *Page 91